**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

VALLEY FORGE RENAISSANCE, L.P.,      )
                                     )
    Plaintiff/Counter-Defendant,     )
                                     )
           v.                   )      Case No. 1:09-cv-00131-TWP-MJD
                                     )
GREYSTONE SERVICING                  )
CORPORATION, INC.,                   )
                                     )
    Defendant/Counter-Claimant.      )

**AMENDED**
**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This lawsuit arises out of a commercial loan agreement gone awry.  Plaintiff Valley

Forge Renaissance, L.P. ("Valley Forge") is an Indiana limited partnership engaged in the

acquisition, rehabilitation, and management of tax-advantaged, multi-family housing complexes

in Indianapolis, Indiana.  While renovating a multi-unit rental housing project (the "Project"),

Valley Forge sought a fixed rate post-construction permanent loan, which it found from

Defendant Greystone Servicing Corp. ("Greystone"), a Fannie Mae Delegated Underwriting and

Servicing ("DUS") lender (in other words, a mortgage banking firm approved by Fannie Mae to

underwrite, close, and sell to Fannie Mae multi-family loans).  In September 2007, Greystone

and Valley Forge entered into a Permanent Loan Commitment (the "Commitment").  The

Commitment contained a rate lock mechanism, allowing Valley Forge to lock in an interest rate

12 months in advance of closing the loan.  On October 4, 2007, Valley Forge locked in an

interest rate of 7.13% and a maximum loan amount of $4,377,700.00.

To mitigate the risks associated with fluctuating market rates, Greystone required Valley

Forge to pay certain "Deposits."  First, Valley Forge had to pay an Initial Delivery Assurance

Deposit equal to 3% of the loan balance ($135,000.00) before locking in the interest rate.  From there, if the 10-year Treasury rates dropped a certain number of points, Greystone required Valley Forge to pay Additional Delivery Assurance Deposits.  Under the relevant provision of the Commitment, Valley Forge had to pay such Deposits "upon notice from Greystone." The Commitment also added that "[t]ime is of the essence regarding all … terms … set forth in this Commitment."   Notably, however, the Commitment contained no specific deadlines with respect to due dates for Deposits or "time of the essence".

The 10-year Treasury trended downward in late 2007 and early 2008, and Greystone sent Valley Forge notices stating that a Deposit was due within 48 hours.  Valley Forge paid two such Deposits in 2008, but did so in a belated fashion, paying one 11 days after the 48 hour requested deadline and another 34 days after the deadline.  Nonetheless, Greystone accepted these Deposits without declaring that Valley Forge was in default.  To make these payments, Valley Forge tapped a line of credit that it had with KeyBank.

Then, in November 2008, chaos ravaged the financial markets, and the 10-year Treasury dropped sharply.  Accordingly, on November 20, 2008, Greystone sent Valley Forge a notice that a Deposit of $130,392.00 was due on or before November 24, 2008 at 3:00 p.m. to "avoid default of the Commitment and loss of all existing deposits." On November 25, 2008, Greystone drafted a notice of default letter, but provided a new deadline of December 1, 2008. The very next day, November 26, 2008, Greystone had a change of heart and sent an email rescinding the previous letter and permanently terminating the Commitment.  Valley Forge wired the Deposits on November 26, 2008, which Greystone considered as two days late.  Due to the belated payment, Greystone terminated the Commitment and returned Valley Forge's latest Deposit, but retained all other Deposits.  Arguably, Greystone's decision to terminate may

have been a stroke of luck for Valley Forge. In the aftermath of Greystone's decision to terminate, Valley Forge obtained new financing for the Project at a much lower interest rate.

Valley Forge has filed an amended complaint which contains four counts: (1) breach of contract, (2) conversion, (3) theft, and (4) violation of the Indiana Securities Act.  Greystone responded with a counterclaim for breach of contract stemming from hedging losses, in excess of the retained Deposits, attributable to the termination of the Commitment.  Each side has now filed a motion for summary judgment. Greystone's motion encompasses all four of Valley Forge's counts and its own counterclaim for breach of contract.  Valley Forge's motion only covers the breach of contract claims (both its own and Greystone's) and the Indiana Securities Act claim—not its state law claims for theft and conversion.

Oral arguments were held on March 28, 2012, and the Court thanks all counsel for their excellent and professional advocacy.  For the reasons set forth below, Greystone's Motion for Summary Judgment (Dkt. 98) is **GRANTED** with respect to Valley Forge's claims for theft, conversion, and violating the Indiana Securities Act, and **DENIED** with respect to Valley Forge's breach of contract claim and its own breach of contract counterclaim. Valley Forge's Motion for Partial Summary Judgment (Dkt. 99) is **DENIED** in its entirety.  Simply stated, the Court finds that the parties' competing breach of contract claims are the only claims suitable for trial.

## I.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476

F.3d 487, 489-90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted).  Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## II. <u>BACKGROUND</u>[1]

**A.     Valley Forge and Greystone enter into the Commitment**

Valley Forge, a rental housing developer, embarked on the Project, which involved 140 housing units located in Indianapolis, Indiana.  For the acquisition and construction phase of the Project, Valley Forge obtained a short term floating rate construction loan from KeyBank.  Subsequently, Valley Forge sought a fixed rate post-construction permanent loan to replace the KeyBank loan.  To that end, Valley Forge hired a mortgage broker, who recommended

---

[1] The parties engaged in squabbles about evidentiary issues relating to the statement of material facts.  For the sake of economy, the Court will not explicitly adjudicate each mini-dispute. Suffice it to say, this Order represents the Court's earnest effort to piece together an accurate set of facts from the briefing and the record evidence.

Greystone, a mortgage banking firm.  In essence, Greystone makes loans and then sells those loans to Fannie Mae in exchange for mortgage-backed securities.

On September 25, 2007, Greystone and Valley Forge entered into the Commitment, which is governed by Virginia law, whereby Greystone committed to making a future loan when Valley Forge completed construction on the Project.  But, in order to close the loan, Valley Forge had to meet certain performance requirements.  Specifically, under the terms of the Commitment, Valley Forge had to demonstrate that it was "ready, willing, and able to complete closing of the . . . Loan," which entailed various factors that need not be detailed here. Moreover, Valley Forge's failure "to comply with any of the terms and conditions of" the Commitment constituted an event of default.

The Commitment contained a rate lock mechanism, allowing Valley Forge to lock in an interest rate at least 12 months in advance of closing the loan.  This feature enticed Valley Forge to enter the Commitment; by locking in a rate, Valley Forge eliminated the risk of rising interest rates during construction and rehabilitation of the Project.  On this point, Valley Forge writes that it "expected to receive a benefit . . . by locking in an interest rate, thereby limiting its exposure to rate risk over time and fixing its interest costs." (Dkt. 100 at 4.)  On October 4, 2007, Valley Forge locked in an interest rate of 7.13% and a maximum permanent loan amount of $4,377,700.00.  Once the loan closed, Greystone planned to sell the loan to Fannie Mae in exchange for a mortgage-backed security.

Locking in an interest rate ahead of time can be a risky proposition for a lender.  If interest rates subsequently rise, then the lender loses out on the higher interest rates being paid by other borrowers.  Thus, if rates rose by the time Greystone sold the Valley Forge loan to Fannie Mae, then it would be forced to sell the loan at a discount—below the face amount of the

loan. To offset this risk, Greystone used certain hedging activities. Otherwise, it would effectively be making a naked bet on interest rate changes alone—akin to "going to Las Vegas and rolling the dice," in the words of one Greystone employee. The hedging worked as follows: if interest rates increased, then the counterparty would be required to pay Greystone an amount of money, and this money would help offset the discount Fannie Mae would demand for the loan. Greystone's hedging activities, however, were "separate and distinct from" its obligations under the Commitment. Valley Forge did not "particularly care" how Greystone managed the risk of rising interest rates, so long as Greystone complied with its end of the bargain.

If, on the other hand, interest rates dropped, then Greystone could sell the loan to Fannie Mae at a premium—above the face amount of the loan. But, also, Greystone would be required to make payments to the counterparty on the hedge. Moreover, another risk arose if interest rates dropped: specifically, Valley Forge might abandon the Commitment to seek out a more favorable loan from a different lender. So, from Greystone's vantage point, if interest rates dropped, the value of the loan effectively increased while it had to pay out money to counterparties. Therefore, Greystone had a strong incentive to ensure that Valley Forge didn't walk away from the loan, so that Greystone had a valuable loan to sell to Fannie Mae to offset its payments to the counterparty on the hedge.

To that end, Greystone required Valley Forge to put some of its skin in the game. Specifically, Valley Forge had to pay an Initial Delivery Assurance Deposit equal to roughly 3% of the loan balance before the interest rate was locked. Valley Forge paid this amount ($135,000.00) on September 21, 2007. In addition, if the 10-year Treasury (called the "Benchmark Treasury" in the Commitment) rates dropped a certain number of points,

Greystone required Valley Forge to pay Additional Delivery Assurance Deposits from Greystone. Section 2(G) of the Commitment states as follows:

> If, after Rate Lock and prior to Permanent Loan Closing, the interest rate of the Benchmark Treasury drops by more than 33 basis points, Borrower shall pay an additional three percent (3%) Delivery Assurance Deposit <u>upon notice</u> from Greystone. In addition, for each additional 11 basis point drop, Borrower must pay an additional one percent (1%) Delivery Assurance Deposit.

Section 15 of the Commitment also added that "<u>[t]ime is of the essence</u> regarding all matters, provisions terms, and requirements set forth in this Commitment." Greystone agreed to refund all of Valley Forge's Deposits if it performed its obligations under the Commitment, "[u]pon the successful purchase of the Permanent Loan by Fannie Mae[.]" At the time Valley Forge locked in its interest rate, the 10-year Treasury rate was 4.52%.

## B. Declining 10-year Treasury Rates Trigger Deposit Payments

In 2007 and 2008, the rate of the 10-year Treasury dropped, and Greystone sent Valley Forge notices stating that a Deposit was due within 48 hours. However, this 48-hour timeline is not found in the Commitment. Moreover, Valley Forge never paid within 48 hours. Valley Forge explains that its lagging payments were attributable to two factors: (1) to pay the Deposits, it had to tap a line of credit from KeyBank, and it took KeyBank more than 48 hours to process the requests; and (2) the structure of the Valley Forge partnership made it difficult, if not impossible, to act quickly enough to pay a Deposit within 48 hours.

By waiting more than 48 hours to pay its Deposits, Valley Forge arguably engaged in risky behavior. In fact, one of Valley Forge's brokers, Dan Mellon, had previously emphasized the need to pay the Deposits by Greystone's deadlines, writing in an email that Greystone has "the right to break the lock if you haven't responded within 48 hours." On this point, Mr.

Mellon testified at his deposition that Valley Forge "should follow the obligation and get the additional deposit in within 48 hours." In a similar vein, Mr. Mellon testified as follows:

> Q.      Okay. Did you advise [Valley Forge] . . . that if the additional good faith deposits were not paid within 48 hours, that the rate lock commitment could be terminated by . . . Greystone.
>
> A.      Yes, I do recall advising that within the terms of the agreement, they could terminate the rate lock commitment.

Accordingly, Mr. Mellon recommended to Valley Forge that it should have "additional funds" set aside, "to be ready" to pay if 10-year Treasury rates dropped, especially given the volatility in the Treasury market at that time. At one point, Brad Richey, the Valley Forge representative, acknowledged by way of email that [i]f we don't send [the Deposit] soon, we risk the chance that Greystone will break the hedge and we're out both deposits."

In any event, the following is a summary of the key Deposit-related transactions between Greystone and Valley Forge:

- December 5, 2007:  Greystone seeks Deposit within 48 hours, but interest rates apparently rebound above the trigger amount, so that the Deposit was no longer necessary.

- January 12, 2008:  10-year Treasury rate drops to 3.84%; Greystone seeks a 4% Deposit of $175,108.00 within 48 hours; Valley Forge pays on January 25, 2008 (roughly 11 days after the due date); Greystone accepts the Deposit without declaring Valley Forge to be in default, notwithstanding the 48-hour deadline.

- February 4, 2008:  Greystone seeks Deposit within 48 hours, but interest rates apparently rebound above the trigger amount, so that the Deposit was no longer necessary.

- March 20, 2008:  10-year Treasury rate drops to 3.33%; Greystone seeks Deposit of $132,269.38 to be paid within 48 hours; Valley Forge pays on April 24, 2008 (roughly 34 days after the due date); Greystone accepted the Deposit without declaring Valley Forge to be in default, notwithstanding the 48-hour deadline.

The Commitment was scheduled to expire on October 4, 2008. But on September 25, 2008, in exchange for $32,833.00 from Valley Forge, Greystone extended the Commitment to January 4, 2009. This transaction was specifically contemplated by Section 9 of the Commitment, which provided that "[i]f Permanent Loan Closing does not occur on or before the Closing Deadline, Greystone shall extend this Commitment and the Closing Deadline up to six (6) months for an extension fee of one quarter percent (1/4%) of the Maximum Permanent Loan Amount per month . . . ."

## C.    The Termination

November 2008 was, to put it charitably, a tumultuous time in the world financial markets. Seeking the relative safety and security of the United States government—a safe investment compared to nearly all others—investors flocked to Treasuries, and the rate on the 10-year Treasury dropped significantly. On November 20, 2008, Greystone sent Valley Forge a notice that the 10-year Treasury had dropped to 3.17%; accordingly, a Deposit of $130,392.00 was due on or before November 24, 2008 at 3:00 p.m. to "avoid default of the Commitment and loss of all existing deposits." Valley Forge's broker was "alarmed" by this particular notice because it seemed "more urgent." In other words, "[t]he tone of the situation had changed versus previous rate lock communications." Apparently, given the havoc in the economy, Greystone was finally insisting on a prompt payment. On this point, Greystone writes that "[b]ecause of the magnitude of the interest rate decrease and because the Project was now complete . . . Greystone could no longer accommodate a late payment of a Deposit." (Dkt. 98-3 at 4.) Along similar lines, Valley Forge wrote that "[t]he drop significantly increased Greystone's exposure and risk, particularly in light of its hedged positions." (Dkt. 100 at 11.)

Valley Forge tapped its line of credit with KeyBank to pay this Deposit, but did not make the payment by the deadline.  KeyBank's records show that it did not begin processing a request for funds until November 24, 2008, and the funds were authorized for disbursement on November 25, 2008.  In light of the missed deadline, on November 25, 2008, Greystone sent Valley Forge a notice of default letter by registered mail and Federal Express, but provided a new deadline (a "cure period," as one Greystone employee called it) for the Deposit:  December 1, 2008 by 5:00 p.m.  On the very next day, however, Greystone sent a "replacement letter" via email, stating that the previous letter was sent "in error."  This letter rescinded the previous letter and permanently terminated the Commitment.  On November 26, 2008, the Deposit was wired to Greystone, which returned that Deposit but retained all previous Valley Forge Deposits.  Under the Commitment, if Greystone terminated the Commitment based on an event of default, it was entitled to retain the Deposits, fees, and expenses that it collected from Valley Forge.

Notably, Greystone has represented to the Court that all of its other borrowers who had Commitments with rate lock features and who were sent similar notices paid their Deposits before the deadline.  Greystone later closed loans with all such borrowers, unless the Commitments had expired.  Moreover, it is undisputed that Greystone had adequate funding to close Valley Forge's loan for the agreed amount.

**D.    The Aftermath**

In the wake of the termination, each side alleges that it suffered losses.  Valley Forge lost its Deposits and other costs associated with the Commitment.  Greystone, meanwhile, suffered hedging losses in excess of the Deposits retained, in an amount of $621,279.00, when it closed the final hedges related to the Valley Forge transaction.  (Dkt. 98-3 at 25.)  According to

Greystone, the Commitment requires Valley Forge to foot the bill for these losses. For instance, Section 15 provides that Valley Forge "shall be liable to Greystone for any and all losses, damages, costs, and expenses, including but not limited to reasonable attorneys fees, that Greystone suffers or incurs … as a result of [Valley Forge's] action . . . to close the . . . Loan[.]"

To continue financing the Project, Valley Forge used construction loans with interest rates between 4% and 6%. Notably, in 2009, Valley Forge pursued a Fannie Mae loan, but Fannie Mae refused to purchase the loan because one of the principals of Valley Forge, Brad Richey, had an undisclosed federal income tax lien. Fortunately, though, Valley Forge then obtained financing through a loan from the Department of Housing and Urban Develoment ("HUD") for $4,710,000.00 at an interest rate of 3.75%. Obviously, this loan was a good deal for Valley Forge, considering the rate on Greystone's loan was 7.13%.

In January 2009, Valley Forge filed the present action, alleging that Greystone unilaterally and unjustly terminated the Commitment. Valley Forge's First Amended Complaint (Dkt. 80) contains four counts: (1) anticipatory repudiation/breach of contract, (2) conversion (which allows for treble and punitive damages), (3) theft (which also allows for treble and punitive damages), and (4) violation of the Indiana Securities Act. Greystone responded with a counterclaim for breach of contract stemming from its hedging losses (Dkt. 85). Additional facts are added below as needed.

### III.   DISCUSSION

#### A.   Greystone's Breach of Contract Counterclaim

The parties' competing contract claims implicate a host of legal issues. Beginning with Greystone's counterclaim, which asks the question: was the language "upon notice" and "time is of the essence" provisions adequate to allow Greystone to subsequently impose a concrete

deadline for payment of a Deposit?  Valley Forge argues that it would be fundamentally unfair to graft a 48-hour standard onto the Commitment when: (1) no such standard is explicitly contained in the Commitment; (2) it is unclear if Valley Forge was even capable of tapping its line of credit with KeyBank within 48 hours; (3) it is unclear if, for instance, "48 hours" includes weekends and holidays; and (4) the parties' prior course of dealings suggests that the 48-hour deadline was not of particular importance to Greystone.

The Commitment does not specify a time for paying Deposits; instead, it just uses the phrases "upon notice" and "[t]ime is of the essence."  Under Virginia law, "[w]hen a contract does not specify a time for performance, the law implies a reasonable time." *Appalachian Power Co. v. John Stewart Walker, Inc.*, 201 S.E.2d 758, 767 (Va. 1974) (emphasis added; citation omitted).  Further "[i]t is well settled that it is for the jury to say what is a reasonable time, under all the circumstances of the case, under proper instructions from the court." *Id.* (citation and internal quotations omitted).  Because the Commitment did not contain an *explicit* time for payment, the Court is reluctant to impose a concrete deadline.  And given the factual circumstances surrounding this case, the issue of timing does not have an obvious answer, and a reasonable trier of fact could reach different conclusions.  Accordingly, whether Valley Forge breached by failing to comply with the timing deadline imposed by Greystone is best left for the trier of fact to resolve.

Next, Valley Forge argues that Greystone's previous acceptance of Deposits after the 48-hour deadline bars it from subsequently demanding strict compliance with a deadline.  According to Valley Forge, the parties' course of dealing prevented Greystone from ever imposing a hard-and-fast deadline.  The Court is not persuaded that this argument carries the day at the summary judgment stage.  In effect, Valley Forge's argument is that Greystone

*waived* its ability to enforce any timing provisions. Under Virginia law, however, "express terms" of a contract "prevail over course of performance, course of dealing, and usage of trade." Va. Code § 8.1A-303(e)(1). And, here, Section 19 of the Commitment provides that "[a] waiver by Greystone of any terms or conditions of this Commitment shall only be enforceable if made in writing and shall not constitute a continuing waiver of strict performance of such provision in the future." Moreover, it is worth emphasizing that Greystone's November 20, 2008 notice and follow-up communications arguably provided Valley Forge with the clear notice of Greystone's intentions to demand strict compliance with the payment deadline—and the consequences if Valley Forge failed to meet that deadline.

The next issue relates to damages. Specifically, Valley Forge writes that even "[o]n its best day, Greystone . . . is not entitled to the hedging losses and attorneys' fees that it claims pursuant to the terms of the . . . Commitment." (Dkt. 109 at 19.) According to Valley Forge, Greystone has already retained all that it is entitled to, even if it wins: there is nothing left for Greystone to recover.

The Court is not persuaded. Section 15 of the Commitment states that if Greystone terminates the Commitment, then Valley Forge "shall be liable to Greystone for any and all losses . . . including but not limited to reasonable attorneys fees, that Greystone suffers or incurs as a result of its inability . . . to close the Permanent Loan in accordance with this Commitment." Here, Greystone incurred $1,063,065.38 in hedging losses when it closed its remaining hedges related to the Valley Forge transaction, and Valley Forge paid a total of $442,377.38 in Deposits. Thus, Greystone suffered $621,279.00 in losses in excess of the Deposits. Although not unmistakably clear from the Commitment, the Court finds that the issue of whether Greystone is entitled to compensation for its hedging losses is a question of fact for

the trier of fact. Indeed, it appears that courts have allowed lenders to recover hedging losses under similar circumstances. *See WisConn Invs., LLC v. Wells Fargo Bank, N.A.*, 2009 WL 1765999, at *4 (W.D. Wis. June 22, 2009) ("[W]hen interest rates decline and a rate-locked loan does not close, the bank is left with a swap contract that has declined in value, and it cannot offset the swap loss with a gain from the securitized loan . . . . This is an actual loss . . . Cherry Point's contention that Wells Fargo suffered no losses when it broke the hedge is mistaken, and all claims based on such notion fail.").

Finally, the Court is not persuaded by Valley Forge's contention that Greystone lacks standing to recover hedging losses because Greystone Funding Corporation—a different appendage of Greystone—handled the execution of hedging transactions on Greystone's behalf. Greystone was the entity financially responsible for the hedging losses, meaning it has standing to recover for those losses. Because Greystone's contract claim is best left for the trier of fact, the parties' motions for summary judgment are denied with respect to this claim.

**B.    Valley Forge's Breach of Contract Claim**

Valley Forge's breach of contract claim centers on the theory of anticipatory repudiation, which is defined as "[r]epudiation of a contractual duty before the time for performance, giving the injured party an immediate right to damages for total breach, as well as discharging the injured party's remaining duties of performance." BLACK'S LAW DICTIONARY 615 (3d. pocket ed. 2006). According to Valley Forge, Greystone committed an anticipatory breach because it "had no contractual right under the Loan Commitment to require receipt of [Deposits] . . . by a specified date." (Dkt. 100 at 18.)

As discussed above, the issue of whether Valley Forge breached the Commitment by failing to meet a Deposit deadline is an issue for the trier of fact. If, for instance, the trier of fact

found that Valley Forge's failure to pay constituted a *material* breach, then Valley Forge's breach of contract claim would necessarily fail: "Generally, a party who commits the first breach of a contract is not entitled to enforce the contract." *Horton v. Horton*, 487 S.E.2d 200, 203 (Va. 1997). This rule applies if the breach is *material*, which is defined as a failure to do something that is "so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Id.*

Nonetheless, Valley Forge can still prevail if a trier of fact finds that: (1) Greystone was simply not permitted to graft a concrete due date for a Deposit onto the Commitment; or (2) even if Valley Forge breached the Commitment by failing to pay the Deposit at the time specified by Greystone, the breach was not *material*. *See id.* (noting an exception to that general rule "when the breach did not go to the 'root of the contract' but only to a minor part of the consideration") (citation omitted). Thus, the Court finds that Valley Forge has a potentially viable anticipatory repudiation theory anchoring its breach of contract claim.

But to have a viable breach of contract claim in Virginia, Valley Forge must be able to show damages. *See Brown v. Harms,* 467 S.E.2d 805, 807 (Va. 1996) (an element of breach of contract is "a consequential injury or damage to the plaintiff"). Thus, Valley Forge cannot prevail on a breach of contract claim if the party cannot show that the alleged breach caused damages. *See HCP Laguna Creek CA, LP v. Sunrise Senior Living Mgmt., Inc*., 737 F. Supp. 2d 533 (E.D. Va. 2010) (while manager sufficiently demonstrated that owners of senior living facilities failed to perform under the parties' management agreement, it did not establish breach of contract claim under Virginia law since it did not show that the alleged breach caused actual damage). Moreover, "[t]he basic common law measure of damages for breach of a loan agreement is the difference between the contract rate of interest and the rate of interest that the

borrower is required to pay from another source." *Salam v. Nat'l Future Mortgage, Inc*., 2000 WL 1053907, at *1 (Va. Cir. Ct. June 2, 2000) (citations omitted); *see also Polar Steamship Corp. v. Inland Overseas Steamship Corp*., 136 F.2d 835, 842 (4th Cir. 1943) (in breach of contract to lend money cases, "the measure of damages is the additional cost of obtaining a loan from another").

Notwithstanding the ethicality of its actions, Greystone's decision to terminate was arguably a blessing in disguise for Valley Forge. Specifically, after Greystone terminated the Commitment, Valley Forge was able to continue using the Construction Loan, which had interest rates between 4% and 6%, while it sought alternative permanent financing. Then, Valley Forge obtained a HUD Loan for a larger amount, for a longer term, and at a lower 3.75 percent rate (as compared to the 7.13 percent rate). Greystone, through an affidavit of Robert Barolak, estimates that its decision to terminate the Commitment resulted in a total present value savings to Valley Forge of approximately $1,233,606.00. Because this amount exceeds the breach of contract damages sought by Valley Forge, Greystone argues, Valley Forge has suffered no damages and therefore does not have a viable breach of contract claim against Greystone.

Valley Forge responds with two arguments: (1) even if Greystone's termination resulted in a net savings for Valley Forge, it is still entitled to special damages; and, (2) Greystone's damages calculation is wrong, and the termination actually did cause Valley Forge to suffer a net loss. First up is the special damages argument. Virginia law is fairly scant on this issue. The court in *Polar Steamship*, 136 F.2d 835, noted that if "the lender knows of circumstances which will render it impossible for the borrower to obtain such loan and knows that he will suffer special damage as a result of the breach of contract, such special damage is recoverable." *Id*. at

16

842. Obviously, it was not "impossible" for Valley Forge to find a replacement loan; to the contrary, Valley Forge found a *better* loan.

Valley Forge also makes much of the dicta in *Harding v. Pan American Life Ins. Co.*, 452 F. Supp. 527 (E.D. Va. 1978), where the district court stated that "[i]t would be inequitable to permit proposed lender to purposely obstruct the closing of a loan and then claim a right to retain the deposit." *Id.* at 529. Notably, to effectuate this principle, the court conducted "a two step inquiry in examining such loan commitment fees." *Id.* First, the court determined "whether the fee is reasonable under the circumstances of that proposed loan." *Id.* Here, there is no suggestion that the Deposits were unreasonable. Second, the court determined "whether the proposed lender acted in good faith." As the Court will discuss in more detail below with respect to the theft and conversion claims, the Court finds that Greystone acted in good faith in this bona fide contract dispute. Ultimately, in *Harding*, the court granted the lender's motion for summary judgment, finding that "the deposit may be retained" and "such fees are a fact of financial life and a manner of doing business in the mortgage finance world." *Id.*  In sum, the Court finds that Valley Forge is not entitled to special damages.

Valley Forge's fallback argument, although not crystal clear, seems to be that, contrary to Greystone's contentions, it actually lost money due to the termination. To bolster this position, Valley Forge cites an affidavit from Brian Murphy, a managing member of Valley Forge, who "performed an analysis of the interest rate differences between the . . . Commitment at issue . . . and the HUD financing [that] Valley Forge obtained[.]" Murphy claims that Greystone's calculation fails to consider "carry costs," which consist of (1) "the expenditure of additional fees . . . that, but for Greystone's actions, Valley Forge would not have incurred" and (2) the "interest on the line of credit that [Valley Forge] set up to obtain the required

[Deposits]." Murphy also disputes the "discount rate" that Greystone used in its calculation (4.25%), claiming that "[a] discount rate of 7.5% is more realistic." In light of these considerations, Murphy contends, Valley Forge's actual savings from alternative financing "is at best $385,490.00."

The Court interprets Valley Forge's difficult-to-decipher argument to be that it still suffered damages, even accounting for the savings it received from alternative financing. Specifically, Valley Forge (not accounting for savings from the alternative financing) seeks damages for its contract claim in the amount of $598,699.81. (Dkt. 100 at 20.)  Thus, even accounting for the savings from alternative financing, it still suffered damages of roughly $213,209.81 ($598,699.81 - $385,490.00).

Greystone responds by pointing out analytical and evidentiary flaws in Murphy's affidavit (e.g. "Murphy does not provide any documentary support to show the date any loan was actually entered into, the amount of any such loan, or the interest rate on any loan that Valley Forge entered into to cover interest on the Deposits."). (Dkt. 120 at 14.) These arguments are well-taken.  But, in the end, the Court finds that Valley Forge has done enough (perhaps the bare minimum) to create genuine issues of material fact on the issue of whether it suffered a net loss.  That being said, it is worth noting that, at trial, Valley Forge's potential damages will be limited to its alleged *net losses* resulting from the termination.  (Again, if the Court's understanding is correct, this amount is $213,209.81.)

There is one final problem with Valley Forge's damages, as they are arguably speculative for a completely different reason.  That is, even if Greystone never terminated the Commitment, it is unclear if Valley Forge would have been able to close the loan due to Mr. Richey's tax lien.  On this point, Valley Forge does itself no favors, writing that "we will never

18

know whether [Valley Forge] would have been able to meet the obligations of the Loan Commitment because Greystone deprived Valley Forge of that opportunity by tortiously terminating the Loan Commitment." (Dkt. 119 at 8) (emphasis added). Moreover, Virginia law is clear that "[d]amages that are contingent, speculative, and uncertain are not recoverable because they cannot be established with reasonable certainty," and "[t]he plaintiff bears the burden to establish the element of damages with reasonable certainty." *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 135 (Va. 2009) (citations omitted).

Greystone's argument concerning the speculative nature of Valley Forge's damages certainly has some appeal. But, in the end, the Court rules that this issue is best left for the trier of fact, who will calculate damages under Virginia law. Reasonable certainty is not "mathematical certainty," and every damages calculation in a breach of contract case is "fact specific." *Nichols Const. Corp. v. Virginia Machine Tool Co., LLC*, 661 S.E.2d 467, 472 (Va. 2008) (citations omitted) Therefore, "a plaintiff is only required to furnish evidence of sufficient facts to permit the trier of fact to make an intelligent and probable estimate of the damages sustained." *Id.* (citation and internal quotations omitted). The Court finds that Valley Forge has met this modest burden. Accordingly, by perhaps the slimmest of margins, the Court denies the parties' motions for summary judgment with respect to Valley Forge's contract claim. A contrary ruling would risk jumping the gun by weighing evidence and resolving issues of fact at the summary judgment stage.

## C.    Valley Forge's Theft and Conversion Claims

The Court now turns to Valley Forge's theft and conversion claims. These Indiana state law claims are based on Valley Forge's contention that Greystone "knowingly and intentionally exerted and continues to exert unauthorized control over Valley Forge's property including,

without limitation, the Deposits and all fees, expenses, documents and things delivered to Greystone or obtained by Greystone in contemplation of closing the transaction described in the Commitment." (Dkt. 80 at 12-13.) As demonstrated above, this case is a bona fide contract dispute, notwithstanding Valley Forge's attempt to insinuate that Greystone acted with some nefarious motive. Importantly, "[t]he Indiana legislature did not intend to criminalize bona fide contract disputes." *French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1168 (Ind. Ct. App. 2008).

To prevail on conversion and theft claims, Valley Forge would have to establish that Greystone "knowingly or intentionally exert[ed] <u>unauthorized control</u> over the property" of plaintiff. Ind. Code §§ 35-43-4-2(a) and 35-43-4-3 (emphasis added). In essence, Greystone must have acted with the requisite *mens rea*. But where, as here, a "defendant believes it has a contractual right to the property at issue, the *mens rea* requirement is defeated and plaintiff cannot state a claim for relief . . . ." *French-Tex*, 893 N.E.2d at 1167; *see also SMC Corp. v. Peoplesoft USA, Inc.*, 2004 WL 2538641, at *6 (S.D. Ind. Oct. 12, 2004) (same); *Dean v. Kruse Foundation, Inc. v. Gates*, 932 N.E.2d 763, 769 (Ind. Ct. App. 2010) (conversion claim was "nothing more than a repackaged version of his breach of contract claim, brought to 'up the ante'").

Here, the Commitment allowed Greystone to retain Valley Forge's Deposits if it defaulted, and the evidence indicates that Greystone had a good faith belief that Valley Forge defaulted. *See Dean*, 932 N.E.2d at 769 ("No such *mens rea* exists here. Gates's conversion claim was based on the Kruse Parties' retention of his $100,000.00 payment of earnest money; such retention was expressly allowed under the contract in the event of the purchaser's breach."). At its core, this case is a garden-variety contract dispute and Valley Forge cannot

adduce evidence raising the specter that Greystone knowingly or intentionally exerted unauthorized control over the Deposits. Therefore, summary judgment is warranted in Greystone's favor on these claims.

**D.    Valley Forge's Indiana Securities Act Claim**

Finally, Valley Forge alleges that Greystone violated the Indiana Securities Act by offering and selling the rate lock mechanism—which was part of the Commitment—without registering it or registering as a "broker-dealer" or "investment adviser." (Dkt. 80 at 14-15.) Specifically, Valley Forge alleges that the rate lock mechanism falls within two different categories of "security" under Indiana law: "(1) an investment contract, or (2) a margin account for the purchase of commodities or commodity futures contract." (Dkt. 100 at 23.)

**1.    Investment Contract**

Beginning with Valley Forge's "investment contract" argument, it is first worth noting that Ind. Code § 23-19-1-2(28) defines "security" by exhaustively listing various instruments, but does not specifically mention "rate locks," "commercial loans," or "commitments." Nonetheless, the absence of such terms is not dispositive. When determining whether an instrument qualifies as an investment contract, and therefore a security, Indiana courts avoid mere labels and instead look to the economic reality of a transaction. Specifically, Indiana has adopted two tests for determining whether an instrument qualifies as a security: (1) the *Howey* test and (2) the risk capital test. *Indiana ex rel. Naylor v. Indiana State Teachers Ass'n*, 2010 WL 1737914, at *3 (S.D. Ind. April 28, 2010).

The *Howey* test states that an investment contract exists whenever a person (1) invests money (2) in a common enterprise (3) premised upon a reasonable expectation of profits (4) to be derived from the entrepreneurial or managerial efforts of others. *Securities and Exchange*

*Comm'n v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). Under the risk capital test, an investment contract also includes "[a]ny investment of money or money's worth in the risk capital of a venture with the expectation of some benefit to the investor where the investor has no direct control over the investment or policy decision of the venture." *Naylor*, 2010 WL 1737914, at * 3 (citation omitted).

Importantly, both tests require the instrument at issue to be an *investment*, which occurs when an entity parts with its money or another form of bargained-for consideration "in the hope of receiving profits [or some benefit] from the efforts of others." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 858 (1975). Here, the rate lock mechanism was not an investment, which is necessarily accompanied by at least some degree of risk. Instead, Valley Forge merely purchased certainty in the form of a locked interest rate. This simply meant that if the parties closed the loan, Greystone would have to charge a 7.13% interest rate, even if interest rates changed between the date of the rate lock and the date of the closing. And, prior to the loan closing, Valley Forge was required to make Deposits that would later be refunded (without any interest or profit), if it complied with the terms of the Commitment. Plainly stated, there was simply no risk *inherent in the financial instrument itself*. The only risk was that Valley Forge would not comply with the terms of the Commitment. But, obviously, risk of consequences flowing from non-performance is an inherent part of *any* contract.

When asked about this issue at oral arguments, Valley Forge essentially responded that the proof is in the pudding: if there is no risk, they posited, then how did we get embroiled in this lawsuit? But, again, the risk that precipitated this lawsuit relates to compliance with the terms of the Commitment—not with the actual *instrument itself*. If Valley Forge performed all of its obligations under the Commitment (paying Deposits "upon notice," meeting the requisite

performance requirements, and closing the loan), then it would receive exactly what it expected: a permanent loan with a fixed interest rate. In other words, Valley Forge was dependent on its own performance to obtain the loan. *See United States v. Namer*, 680 F.2d 1088, 1096 (5th Cir. 1982) (loan commitment was not a security because the borrower came with the intention to arrange the financing of a construction project, not with the expectation of profits). Accordingly, the rate lock mechanism is not an "investment contract" for purposes of the Indiana Securities Act.

### 2.   Margin Account for Purchase of Commodities or Commodity Futures Contracts

Valley Forge also contends that the rate lock mechanism constitutes a "margin account for the purchase of commodities or a commodity futures contract." (Dkt. 100 at 27). Valley Forge defines a margin as "a deposit amount that a customer . . . must pay toward the purchase … of a financial instrument," and emphasizes that Greystone referred to Deposits as "margin calls" or "margin accounts." (Dkt. 100 at 29.) Moreover, "Greystone maintained separate accounting records of its deposits . . . to facilitate their refund upon the ultimate sale of the [C]ommitment . . . to Fannie Mae." (Dkt. 100 at 30.) From this, Valley Forge argues that "this Court can readily conclude the existence of a margin account." *Id.* Then, Valley Forge argues that Greystone established the "margin account" for "the purchase of commodities or a commodity futures contract" because a locked future interest rate is a "commodity." *Id.*

In the Court's view, Greystone never had a "margin account" for purposes of the Indiana Securities Act. Generally, a "margin" is borrowed money used to purchase *securities*, which (because the money is borrowed) can amplify gains and losses.[2] Buying on the margin

---

[2] For instance, if an investor buys 1 share of stock in Company X for $10.00, and then sells it for $15.00, she has made a 50% profit. If, however, the investor bought the initial share of stock with $5.00 of her own money and $5.00 of borrowed money, she has made closer to *100% profit*. In other words, once the investor pays back the $5.00

occurs in a "margin account" that a customer has with her broker.  And brokers make "margin calls" when the customer needs to deposit more money to cover the securities purchased.  *See, e.g., Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 504 F.3d 189, 194 n.1 (1st Cir. 2007) ("A 'margin account' is a brokerage account in which the broker lends her client cash to purchase securities.  The loan is collateralized by the client's securities or cash.  If the value of the stock drops significantly, the account holder will be required to deposit more cash or sell a portion of the stock."); *S.E.C. v. Betta*, 2010 WL 963207, at *2, n.2 (S.D. Fla. Mar. 15, 2010) ("The SEC explains that a margin call is a demand that more money or securities be deposited in a customer's margin account when the amount in the margin account falls below the amount necessary to cover the securities purchased.").  In this case, Valley Forge overstates the complexity of the Deposits, which were simply installments, triggered by a drop in 10-year Treasury rates, designed to deter Valley Forge from walking away from the loan.  They were not "payments" toward—or to cover for—the purchase of securities or any other financial instruments.  Therefore, the Court finds that, both conceptually and substantively, the Commitment/rate lock mechanism is not akin to a margin account.

While not binding under the circumstances, it is worth noting that, as a general matter, the Seventh Circuit has been careful to distinguish commercial loan transactions from securities.  *See Hunssinger v. Rockford Business Credits, Inc.*, 745 F.2d 484, 492-93 (7th Cir. 1984) ("if a bank or other commercial lender makes a loan to finance business transactions and takes a note in return, the parties could not be said to have participated in a securities transaction"); *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 941 (7th Cir. 1989) ("The Bank's financing arrangement, as we

---

(plus borrowing fees) she has effectively turned $5.00 into $10.00. This borrowing—which amplifies gains and losses—is also known as "leverage," and many economists have cited banks' leverage (high debt to equity ratios) as a contributing factor to the severity of the 2008 financial crisis, as leverage amplified banks' losses to the point of creating systemic risk throughout the financial system.

view it, was not an 'investment' at all, but a mere 'commercial' loan transaction not implicating the federal securities laws."). And perhaps with good reason. As Greystone noted, "[b]ecause every single commercial loan commitment has some mechanism for fixing the interest rate in advance of the loan closing, such a holding could subject every commercial loan commitment to securities law which could create confusion in the industry and jeopardize lenders' ability to offer loan products that provide borrowers with a fixed interest rate." (Dkt. 108 at 5.)

The only case that gives the Court pause is *Greentree Real Estate, LLC v. Bridger Commercial Funding, LLC*, 2009 WL 1922086 (S.D. Ind. July 1, 2009), where Judge Hamilton found that it would be premature to rule, at the motion to dismiss stage, that a "Rate Lock Agreement" entered into to lock in a rate on a loan to refinance an apartment did not constitute a "security." However, both procedurally and substantively, that case is distinguishable. First, Judge Hamilton repeatedly emphasized the case's limited record, stating that "[o]n the limited record before the court, the court cannot say definitively that the Rate Lock Agreement could not be deemed a commodities futures contract (and thus a security)" and "the current record is simply too sparse to allow the court to reach a conclusion with any confidence." *Id*. at *3, *5. Here, the Court is not in a position to wait for a more developed record, as this is summary judgment—the "put up or shut up" moment of a lawsuit. *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) (citation and internal quotations omitted). Substantively, in *Greentree*, some degree of risk appeared to accompany the rate lock agreement. Specifically, "Sections 2 and 5 of the Rate Lock Agreement state that unspecified hedging arrangements will be used to effectuate the 'rate lock.'" *Greentree*, 2009 WL 1922086, *3. Because hedging activities were used to effectuate the rate lock, there is a possibility that, if the hedging activities failed, then

the rate lock would not be available.  The Court's understanding is that such issues do not exist here, as the hedging activities were separate and independent from the rate lock mechanism.

Finally, the Court readily admits that this is not a cut-and-dried question but rather, should be evaluated case-by-case.  As Judge Hamilton noted, "Rate lock agreements have rarely been litigated, especially in the manner proposed in this case." *Id*. at *5.  Simply stated, given the virtual dearth of on-point authority, the Court can only try to apply the law as best as it can. In doing so, the Court finds that the rate lock mechanism (which was part of the Commitment) is neither an "investment contract" nor a "margin account for the purchase of commodities or a commodity futures contract" under the Indiana Securities Act. Accordingly, on this count, summary judgment is granted in Greystone's favor.

## IV.   CONCLUSION

For the foregoing reasons, Greystone's Motion for Summary Judgment (Dkt. 98) is **GRANTED** with respect to Valley Forge's claims for theft, conversion, and violating the Indiana Securities Act, and **DENIED** with respect to Valley Forge's breach of contract claim and its own breach of contract counterclaim. Valley Forge's Motion for Partial Summary Judgment (Dkt. 99) is **DENIED** with respect to all claims.  Simply stated, the Court finds that the parties' competing breach of contract claims are the only claims suitable for trial.


SO ORDERED.    04/18/2012


Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana


26

DISTRIBUTION:

 Michael J. Alerding
ALERDING CASTOR LLP
malerding@alerdingcastor.com

Stephanie Snell Chaudhary
RILEY BENNETT & EGLOFF LLP
schaudhary@rbelaw.com

James W. Riley , Jr
RILEY BENNETT & EGLOFF LLP
jriley@rbelaw.com

Samuel J. Schmutte
ALERDING CASTOR, LLP
sschmutte@alerdingcastor.com

Christopher C. T. Stephen
ALERDING CASTOR, LLP
cstephen@alerdingcastor.com