UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| VALLEY FORGE RENAISSANCE, L.P., ) | |
| ) | |
|    Plaintiff/Counter-Defendant, ) | |
| ) | |
|        v. ) | Case No. 1:09-cv-00131-TWP-MJD |
| ) | |
| GREYSTONE SERVICING ) | |
| CORPORATION, INC., ) | |
| ) | |
|    Defendant/Counter-Claimant. ) | |

### ENTRY ON MOTION TO RECONSIDER

This matter comes before the Court on Plaintiff Valley Forge Renaissance, L.P.'s ("Valley Forge") Motion to Reconsider or in the Alternative Certify for Interlocutory Appeal (Dkt. #136). For the reasons set forth below, Valley Forge's Motion is **DENIED** in its entirety.

### I.  Factual Background

As stated in the Amended Entry on Cross Motions for Summary Judgment (Dkt. #129), this lawsuit arises out of a commercial loan dispute. While renovating a 140-unit rental housing project (the "Project"), Valley Forge sought a fixed rate post-construction permanent loan, which it found from Defendant Greystone Servicing Corp. ("Greystone"). In September 2007, the parties entered into a Permanent Loan Commitment (the "Commitment"), which is governed by Virginia law. As its name implies, the Commitment represents Greystone's commitment to make a future loan to Valley Forge when it completed construction on the Project.

Importantly, the Commitment contained a rate lock mechanism, allowing Valley Forge to lock in an interest rate 12 months in advance of closing the loan. On October 4, 2007, Valley Forge locked in an interest rate of 7.13 percent and a maximum loan amount of $4,377,700.00. Locking in an interest rate carries certain risks for a lender. If interest rates subsequently rise,

then Greystone would be lending at a below-market rate. To offset this risk, Greystone employed certain hedging activities.  If, however, interest rates dropped, then Valley Forge would have an incentive to walk away from the Commitment and seek a lower rate loan from a different lender.

To mitigate the latter risk, Greystone required Valley Forge to pay certain "Deposits." First, Valley Forge had to pay an Initial Delivery Assurance Deposit equal to three percent of the loan balance ($135,000.00) before locking in the interest rate.  From there, if the 10-year Treasury rates dropped a certain number of points, Greystone required Valley Forge to pay Additional Delivery Assurance Deposits.  In other words, the more 10-year Treasury rates dropped, the more Valley Forge had to pay, because its temptation to walk away from the loan would grow stronger.  Under the relevant provision of the Commitment, Valley Forge had to pay such Deposits "upon notice from Greystone." The Commitment also added that "[t]ime is of the essence regarding all . . . terms . . . set forth in this Commitment."  Notably, however, the Commitment contained no concrete deadlines with respect to due dates for Deposits.

In 2007 and 2008, rates of the 10-year Treasury trended downward, and Greystone sent Valley Forge notices stating that a Deposit was due within 48 hours.  Valley Forge paid two such Deposits in 2008, but did so in a belated fashion, paying one 11 days after the deadline and another 34 days after the deadline. Nonetheless, Greystone accepted these Deposits without declaring that Valley Forge was in default.  To make these payments, Valley Forge tapped a line of credit that it had with KeyBank.

Then, in the fall of 2008, turmoil hit the financial markets, and 10-year Treasury rates dropped precipitously. Accordingly, on November 20, 2008, Greystone sent Valley Forge a notice that a Deposit of $130,392.00 was due on or before November 24, 2008 at 3:00 p.m. to "avoid default of the Commitment and loss of all existing deposits."  The parties communicated

back and forth, but, ultimately, Valley Forge failed to make this payment on time. Instead, Valley Forge wired the Deposits two days late, on November 26, 2008. Due to the delayed payment, Greystone terminated the Commitment and returned Valley Forge's latest Deposit, but retained all other Deposits. In the aftermath of Greystone's decision to terminate, Valley Forge obtained additional financing for the Project at a much lower interest rate. In other words, although Valley Forge did not realize it at that time, Greystone's decision to terminate was arguably a blessing in disguise.

In January 2009, Valley Forge filed the present action, alleging that Greystone unilaterally and unjustly terminated the Commitment. Valley Forge brought four different claims against Greystone: (1) breach of contract, (2) conversion, (3) theft, and (4) violation of the Indiana Securities Act. Greystone responded with a counterclaim for breach of contract stemming from hedging losses, in excess of the retained Deposits, attributable to the termination of the Commitment.

## II.   The Court's Summary Judgment Ruling

Each side filed a motion for summary judgment. Greystone's motion covered all four of Valley Forge's counts and its own counterclaim for breach of contract. Valley Forge's motion covered the breach of contract claims (both its own and Greystone's) and the Indiana Securities Act claim – not its state law claims for theft and conversion. In its entry on summary judgment (Dkt. #129), the Court essentially made four separate rulings.

- First, the Court **DENIED** summary judgment on Greystone's breach of contract claim, finding it suitable for trial. Virginia law is settled that, in the absence of an express provision for time of payment, the Court should imply a "reasonable time." *Appalachian Power Co. v. John Stewart Walker, Inc.*, 201 S.E.2d 758, 767 (Va. 1974). A question of fact exists whether Greystone's imposed deadline was "reasonable." Next, the Court determined that Greystone did not waive its claim to timely payment by previously accepting

3

Valley Forge's belated payments, since "express terms" of a contract "prevail over course of performance, course of dealing, and usage of trade." Va. Code § 8.1A-303(e)(1). Finally, the Court concluded that a factual issue exists as to whether Greystone can recover its hedging losses against Valley Forge.

- Second, the Court **DENIED** summary judgment on Valley Forge's breach of contract claim, finding it suitable for trial. The Court found that Valley Forge could prevail on its anticipatory repudiation theory if the Court makes one of the following factual determinations: (1) Greystone was simply not permitted to graft a concrete due date for a Deposit onto the Commitment; or (2) even if Valley Forge breached the Commitment by failing to pay the Deposit at the time specified by Greystone, the breach was not *material*. The Court then turned to damages. Under Virginia law, "[t]he basic common law measure of damages for breach of a loan agreement is the difference between the contract rate of interest and the rate of interest that the borrower is required to pay from another source." *Salam v. Nat'l Future Mortgage, Inc*., 2000 WL 1053907, at *1 (Va. Cir. Ct. June 2, 2000) (citations omitted). Here, following Greystone's termination of the Commitment, Valley Forge received a loan at a much lower interest rate. If this led to a *net* savings, the Court determined, Valley Forge would be precluded from recovering damages. Ultimately, the Court determined that this was a factual issue. Finally, the Court determined that, Valley Forge wasn't entitled to *special damages* under Virginia law.

- Third, the Court **GRANTED** summary judgment on Valley Forge's theft and conversion claims, since this case is nothing more than a bona fide contract dispute. Indiana law is settled that torts like theft and conversion are not viable in cases like this one. *See, e.g., French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1168 (Ind. Ct. App. 2008).

- Fourth, the Court **GRANTED** summary judgment on Valley Forge's violation of the Indiana Securities Act claim. In doing so, the Court rejected Valley Forge's arguments that the rate lock mechanism was an "investment contract" and/or a "margin account." First, the rate lock is not an "investment contract" because it is not an *investment* at all. An investment is accompanied by at least some degree of risk. Under the rate lock, Valley Forge merely purchased certainty in the form of a locked interest rate. This meant that if the parties closed the loan, Greystone would have to charge a certain percent interest rate, even if interest rates changed between the date of the rate lock and the date of the closing. And, prior to the loan closing, Valley Forge was required to make Deposits that would later be refunded if it complied with the terms of the Commitment. Plainly stated, there was simply no risk *inherent in the financial instrument itself* (even if there was considerable risk flowing from a failure to perform on the Commitment). Next, the Court determined that the rate lock mechanism was not a "margin account." Instead, the Deposits were simply installments, triggered by a drop in 10-year Treasury rates, designed to

deter Valley Forge from walking away from the loan. They were not "payments" toward – or to cover for – the purchase of securities or any other financial instruments.

### III.  Discussion

Valley Forge now asks the Court to reconsider each of its rulings "to avoid manifest injustice." (Dkt. 136 at 1). Relief under Federal Rule of Civil Procedure 59(e) is an "extraordinary remed[y] reserved for the exceptional case." *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008).  Specifically, a motion to reconsider is appropriate when the court "has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation omitted). A party seeking reconsideration cannot rehash previously rejected arguments or argue matters that could have been heard during the pendency of the previous motion. *Caisse Nationale de Credit Agricole v. CBI Indus., Inc*., 90 F.3d 1264, 1270 (7th Cir. 1996).

Valley Forge makes four arguments in support of reconsideration: (1) the Court's order improperly limited Valley Forge's damages; (2) the Court failed to consider Section 15 of the Commitment in its entirety; (3) the Court erred by granting summary judgment on Valley Forge's theft/conversion claim; and (4) the Court erred by granting summary judgment on Valley Forge's securities law claim.  Each of these arguments is addressed in turn.

**A.      Did the Court improperly limit Valley Forge's damages?**

In its summary judgment order, the Court ruled that Valley Forge's damages are limited to its "alleged *net losses* resulting from the termination," which, at most, amounts to $213,209.81. (Dkt. #129 at 18) (Emphasis in original.) Valley Forge has at least four problems with this determination.

First, Valley Forge argues – for the first time in this case – that the Court's ruling violates the general rule in Virginia that "'damages are to be determined at the time of the breach of a contract.'" (Dkt. #136 at 2) (quoting *United Virginia Bank of Fairfax v. Dick Herriman Ford, Inc.*, 210 S.E.2d 158, 161 (Va. 1974)). But, as Valley Forge concedes, "*United Virginia Bank of Fairfax* is not a failure to lend case[.]" (Dkt. #136 at 3). It is therefore inapposite; as discussed in the paragraph below, Virginia law employs a different standard in the failure to lend context. Specifically, in *Bank of Fairfax*, damages were determined at the time of breach so as to avoid awarding the prevailing party "damages in excess of the value of the collateral of which it was deprived." *Id*. at 161. Here, too, the Court's ruling is necessitated to prevent Valley Forge from reaping a windfall.

Along these lines, there is a good reason why damages are not calculated at the time of breach in the failure to lend context: it would eliminate the need for the scorned prospective borrower to mitigate damages. In other words, the borrower would not need to exert any effort to seek an alternative loan; instead, it could sit on its hands while the damages pile up. The more applicable Virginia legal principle is that, in the context of failure to lend, "[t]he basic common law measure of damages for breach of a loan agreement is the difference between the contract rate of interest and the rate of interest that the borrower is required to pay from another source." *Salam*, 2000 WL 1053907, at *1 (citations omitted); *see also Polar Steamship Corp. v. Inland Overseas Steamship Corp*., 136 F.2d 835, 842 (4th Cir. 1943) (in breach of contract to lend money cases, "the measure of damages is the additional cost of obtaining a loan from another"). The Court finds this latter principle more persuasive and more conceptually sound. In its reply brief, "Valley Forge asks the Court for clarification" regarding the standard that will be used to

evaluate damages. (Dkt. #140 at 3). The standard articulated in *Salam*, cited above and in the summary judgment order, will be used.

Second, Valley Forge again argues that it is entitled to "special damages." By doing so, it is merely rehashing an old argument, one that the Court already rejected. This fact *alone* warrants denial. To reiterate, the court in *Polar Steamship* noted that if "the lender knows of circumstances which will <u>render it impossible</u> for the borrower to obtain such loan and knows that he will suffer special damage as a result of the breach of contract, such special damage is recoverable." *Id*. (emphasis added). Valley Forge does not challenge this proposition, but instead argues that whether it is entitled to special damages is a question for the trier of fact. This is because, in Valley Forge's words, it could still "show that Greystone knew of circumstances that would render it impossible for Valley Forge to obtain new financing[.]" (Dkt. 140 at 3).

This argument invites the Court to suspend disbelief and ignore reality: Valley Forge *did obtain another loan* – a *better* loan. This fact obviates the need for the Court to speculate about what Greystone knew in 2008 when it terminated the Commitment.  Obviously, Greystone's actions did not "render it impossible for [Valley Forge] to obtain [an alternative] loan[.]" *See Polar Steamship*, 136 F.2d at 842.  Therefore, special damages are not appropriate. Valley Forge states that it "needs clarification as to whether [it] has . . . permission" to make this argument at trial. (Dkt. 140 at 4).  It does not.

Third, Valley Forge argues that it is entitled to "equitable damages," which allegedly hinge on whether the Deposits were reasonable and whether Greystone acted in good faith. As an initial matter, in its summary judgment briefing, Valley Forge did not even mention "equitable damages," let alone argue that it was entitled to them.  This fact *alone* warrants denial.  Nor has Valley Forge cited any Virginia case law supporting the view that "equitable damages" are

7

available under these circumstances. For instance, Valley Forge repeatedly cites *Harding v. Pan American Life Ins. Co.*, 452 F. Supp. 527 (E.D. Va. 1978), but that case does not mention "equitable damages" or support the notion that Valley Forge is entitled to them. To the contrary, the court in *Harding* ruled in favor of a lender, allowing it to keep the borrower's deposits. Finally, contrary to Valley Forge's assertions, there is no evidence suggesting that the Deposits were unreasonable; moreover, as discussed below, this is a bona fide contract dispute, and Greystone had a good faith claim to the Deposits. In the Court's view, no reasonable trier of fact could reach a different conclusion. For these reasons, Valley Forge is not entitled to "equitable damages."

Fourth, and finally, the Court pauses to clarify a point. Valley Forge expresses concern with the fact that, in its summary judgment order, the Court "call[ed] into question the affidavit of Brian Murphy as being speculative[.]" (Dkt. 136 at 4). Then, Valley Forge correctly notes that it is inappropriate for the Court to make credibility determinations or weigh evidence at the summary judgment stage. The Court agrees, which is why the Court did neither at the summary judgment stage. Instead, applying the summary judgment standard at the summary judgment stage, the Court noted that Mr. Murphy's affidavit was enough to create genuine issues of material fact, making this case suitable for trial. In doing so, the Court observed that Mr. Murphy's affidavit was difficult to understand compared to Mr. Barolak's affidavit, which contained straightforward mathematical computations. (Notably, Valley Forge did not dispute these computations.) This was merely an observation, not a legal holding; Valley Forge will be permitted to present evidence and make arguments about why the Court should accept its calculations pertaining to *net losses* suffered as a result of the termination. Contrary to Valley

8

Forge's suggestion, the Court has not "prejudge[d] the weight of the evidence in advance of trial." (Dkt. 140 at 5).

**B.     Did the Court misread Section 15 of the Commitment?**

Section 15 of the Commitment reads as follows:

> **Termination of Commitment; Damages**. Time is of the essence regarding all matters, provisions, terms and requirements set forth in this Commitment. In the event that any condition of this Commitment is not met, Greystone may, in its sole discretion and without liability of any kind, terminate this Commitment in which event any fees, deposits or sums of money previously advanced or paid to Greystone shall be forfeited as liquidated damages. Additionally, Borrower shall be liable to Greystone for any and all losses, damages, costs, and expenses, including but not limited to reasonable attorneys fees that Greystone suffers or incurs as a result of its inability, as a result of Borrower's action or failure to act or that of Borrower's agent to close the Permanent Loan in accordance with this Commitment.

Greystone alleges that, as a result of the termination, it suffered hedging losses. Section 15 notes that, upon termination, Valley Forge would "be liable to Greystone for any and all losses, damages, costs," etc., as a result of Valley Forge's "action or failure to act[.]" Valley Forge contends that Section 15 should not encompass hedging losses, since they are specifically addressed in a different section of the Commitment, Section 2(C). More persuasively, Valley Forge emphasizes that this provision does not apply because the termination was not caused by its own actions or failure to act; rather, Greystone terminated the Commitment in its discretion. These arguments might very well carry the day at trial, and, in turn, the Court will give Valley Forge ample latitude to make them at that time. However, this is not the type of error of "apprehension" that warrants meaningful reconsideration at this stage of the proceedings. If the Court erred, it committed an error of "reasoning." Therefore, Valley Forge's request is denied.

C. **Did the Court err by granting summary judgment on Valley Forge's conversion/theft claims?**

In the Court's view this is a bona fide contract dispute; thus, Valley Forge's theft and conversion claims are not suitable for trial. *See, e.g., French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1168 (Ind. Ct. App. 2008). Valley Forge devotes considerable time highlighting the non-controversial proposition that the existence of a contract does not automatically eliminate the *mens rea* for an independent tort. But that principle doesn't apply with any meaningful force under the circumstances. Here, Greystone sent Valley Forge a warning that it had to pay a Deposit by a given time. A factual issue exists whether Greystone was allowed to do this, since (1) no specific "hard and fast" time for payment was delineated in the Commitment, but (2) a "time is of the essence provision" was included in the Commitment. Valley Forge failed to make the payment in a timely fashion, so Greystone terminated the Commitment, and this dispute arose. In the Court's view, Valley Forge's designations do not evidence criminal intent on the part of Greystone. Further, the facts which Valley Forge now relies upon to show this alleged independent tort or that Greystone had the requisite *mens rea* are not supported by the designated evidence. This is a typical contract dispute – nothing more. Accordingly, Valley Forge's argument is rejected.

D. **Did the Court err by granting summary judgment on Valley Forge's securities claim?**

As discussed above, in its ruling on summary judgment, the Court determined that the rate lock mechanism was neither an "investment" nor a "margin account." In the Court's view, through this motion to reconsider, Valley Forge merely takes old arguments – ones that have already been rejected – and recasts them in a different form. This "second bite at the apple" approach is not persuasive or appropriate at the motion to reconsider stage. *See Brownstone*

*Publishing, LLC v. AT&T*, 2009 WL 799546, at *3 (S.D. Ind. March 24, 2009) (a "Rule 59(e) motion is not an opportunity to relitigate motions or present arguments, issues, or facts that could and should have been presented earlier"). The Court stands by its ruling, and Valley Forge's argument is rejected.

But the Court pauses to re-clarify a point. In its order on summary judgment, the Court stated as follows:

> Here, the rate lock mechanism was not an investment, which is necessarily accompanied by at least some degree of risk. Instead, Valley Forge merely purchased certainty in the form of a locked interest rate. This simply meant that if the parties closed the loan, Greystone would have to charge a 7.13% interest rate, even if interest rates changed between the date of the rate lock and the date of the closing. And, prior to the loan closing, Valley Forge was required to make Deposits that would later be refunded (without any interest or profit), if it complied with the terms of the Commitment. Plainly stated, there was simply no risk *inherent in the financial instrument itself*. The only risk was that Valley Forge would not comply with the terms of the Commitment. But, obviously, risk of consequences flowing from non-performance is an inherent part of *any* contract.

(Dkt. #129 at 22) (emphasis in original). Valley Forge contends that this ruling is internally inconsistent and therefore untenable. Its argument can be summarized as follows. Previously, in the context of Greystone's breach of contract claim, the Court ruled that Valley Forge may be on the hook for Greystone's hedging losses. In the context of Valley Forge's securities claim, however, the Court noted that there "was no risk inherent in the financial instrument itself." How can the Court say there is "no risk inherent" in the rate lock mechanism when Valley Forge might ultimately be responsible for hedging losses over which it had no control? In Valley Forge's view, these incompatible decisions "must be reconciled." (Dkt. #140 at 6). This argument is misguided. Valley Forge's potential responsibility for hedging losses flows from a failure to *perform* on the Commitment or *comply* with its terms; it has nothing to do with risk

11

inherent in the rate lock mechanism itself. That is why the rate lock mechanism is not an investment, but Valley Forge could still be liable for hedging losses.

Finally, Valley Forge, in a conclusory fashion, invites the Court to certify these security issues to the Indiana Supreme Court. (*See* Dkt. 136 at 15) ("In the alternative, the Court should certify this issue to the Indiana Supreme Court for a determination of the application of Indiana law . . . ."). In its initial motion to reconsider brief, Valley Forge does not include any relevant standards or forge any specific arguments explaining why certification is appropriate. Under Indiana Rule of Appellate Procedure 64(A), a federal court may, in its discretion, certify a question of Indiana law to the Indiana Supreme Court when the federal court is faced with an issue of state law that is determinative and there is no clear controlling Indiana precedent.

Here, using its discretion, the Court finds that certification is not particularly appropriate, especially given that certification decisions should be approached with circumspection. *See Brown v. Argosy Gaming Co., L.P.*, 2003 WL 133266, at *1 (S.D. Ind. Jan. 10, 2003) (listing factors to consider when making a certification to the Indiana Supreme Court determination). This is a narrow and esoteric issue, it is not of urgent public concern or likely to recur with frequency, and it is not particularly important to the growth of Indiana's jurisprudence. Therefore, the Court finds that this limited issue is not appropriate for certification to the Indiana Supreme Court.

**E.     Is an interlocutory appeal appropriate?**

Valley Forge also requests that the Court certify these issues for interlocutory appeal to the Seventh Circuit. Interlocutory appeals are governed by 28 U.S.C. § 1292(b), which provides in relevant part:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

Certification under § 1292(b) requires four statutory criteria to be met: (1) there must be a question of law; (2) it must be controlling; (3) it must be contestable; and (4) its resolution must materially advance the ultimate termination of the litigation. *See Richardson Electronics, Ltd. v. Panache Broadcasting of Pennsylvania, Inc.*, 202 F.3d 957, 958 (7th Cir. 2000). "There is also a nonstatutory requirement: the petition must be filed in the district court within a reasonable time after the order sought to be appealed." *Ahrenholz v. Board of Trustees of the Univ. of Illinois*, 219 F.3d 674, 675 (7th Cir. 2000). "Unless all these criteria are satisfied, the district court may not and should not certify its order to [the appellate court] for an immediate appeal under section 1292(b)." *Id.* at 676.

In its opening motion to reconsider brief, Valley Forge did not articulate these standards, let alone explain how they are met. The Court's analysis effectively begins and ends at the fourth criterion – "materially advance[ing] the ultimate termination of the litigation." Here, a trial is set to begin on July 23, 2012. The median appeal time in the Seventh Circuit (as of 2005) was 10.6 months. *See Coan v. Nightingale Home Healthcare, Inc.,* 2006 WL 1994772, *4 (S.D. Ind. July 14, 2006). Simply stated, an interlocutory appeal would not likely materially speed up this litigation. Although it is possible that an interlocutory appeal could obviate the need for a second trial if the Seventh Circuit reverses after a trial is held in this matter, that possibility is not a particularly good reason to allow an appeal where, as here, a trial is fast-approaching. Accordingly, Valley Forge's request is denied.

### IV. Conclusion

For the foregoing reasons, Valley Forge's Motion to Reconsider or in the Alternative Certify for Interlocutory Appeal (Dkt. #136) is **DENIED** in its entirety. The trial in this matter remains set to begin on July 23, 2012.

SO ORDERED.  06/14/2012

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Michael J. Alerding
ALERDING CASTOR LLP
malerding@alerdingcastor.com, cemerson@alerdingcastor.com, knewbold@alerdingcastor.com

Stephanie Snell Chaudhary
RILEY BENNETT & EGLOFF LLP
schaudhary@rbelaw.com

James W. Riley , Jr
RILEY BENNETT & EGLOFF LLP
jriley@rbelaw.com, rmcclintic@rbelaw.com

Samuel J. Schmutte
ALERDING CASTOR, LLP
sschmutte@alerdingcastor.com, jmarks@alerdingcastor.com

Christopher C. T. Stephen
ALERDING CASTOR, LLP
cstephen@alerdingcastor.com, cemerson@alerdingcastor.com